IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| The Standard Fire Insurance Company, | : | |
| | : | Case No. 1:15-cv-805 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Denying Defendant's Motion for |
| Dan Zeisler, | : | Summary Judgment |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 70). The underlying dispute arose after a boat owned by non-party Roy Franklin Smith sank while docked at a marina on the Ohio River in January 2014, and Plaintiff The Standard Fire Insurance Company ("Standard Insurance" or "SFIC") paid Smith on a policy insuring the boat. SFIC has sued Defendant Dan Zeisler, the individual whom Smith hired to winterize the boat, alleging that he did not adequately prepare the boat to withstand the winter weather. Zeisler now moves for summary judgment on this basis asserting that he is not liable for damages to SFIC because he winterized the boat in accordance with Smith's expectations. Because material facts remain in dispute, the Court will **DENY** the Motion.

I.  BACKGROUND

A.  **Factual History**

SFIC issued Travelers Yacht Policy No. 988923213-840-1 ("the Policy"), in effect from May 2013 to May 2014, to CBS, Inc. d.b.a. A Leasing ("CBS"), an entity wholly owned by Smith. (Doc. 67-2 at PageID 769–95.) Travelers Insurance Company is a subsidiary of SFIC. (Pais Dep., Doc. 63 at PageID 545.) The Policy provided $150,000 in coverage on Smith's boat, described as a fifty-foot houseboat. (Doc. 67-2 at PageID 769.) The Policy specifically

1

excluded coverage for "loss or damage caused by or resulting from . . . [t]he insured's failure to properly winterize the yacht or dinghy in accordance with the manufacturer's specifications or customs of the area." (*Id.* at PageID 788.) This section will be referred to herein as the Winterization Exclusion.

The use of the terms "winterize" and "winterization" are at issue in this litigation. David Timpani, an accredited marine surveyor and SFIC's expert opinion witness, described the process of winterization as follows:

> Q. All right. What -- what are the steps, as far as your understanding of winterizing a boat, what are the steps that you take to winterize a boat?
>
> A. Anything that contains water has to be drained or displaced with antifreeze and that would include engines, freshwater plumbing, ice makers, toilets, washing machine, anything that has water going to it or through it –
>
> Q. Okay.
>
> A. -- would need to be winterized to prevent freezing.

(Timpani Dep., Doc. 45 at PageID 353.)

SFIC required Smith to obtain an appraisal or marine survey of the boat in order to obtain the Policy worth $150,000. (Wade Dep., Doc. 65 at PageID 656; Smith Dep. 10/20/17, Doc. 69 at PageID 835, 837–38.) Although Smith had purchased the boat for $69,000, he appears to have obtained an appraisal of the boat in the amount of $150,000 from a marine surveyor named Jack Carnes. (Smith Dep. 12/12/16, Doc. 29 at PageID 106, 118–19.) However, when deposed in this action, Carnes denied appraising the boat or preparing the written $150,000 appraisal. (Doc. 42 at PageID 221–23.) The Court granted Defendant's attorney leave to depose Smith a second time after the Carnes deposition. (Dkt. Entry 10/04/2017.) At the second deposition, Smith testified that he did not remember how he obtained the $150,000 appraisal appearing to be signed by Carnes. (Smith Dep. 10/20/17, Doc. 69 at PageID 837–38.)

In the fall of 2013, Smith paid Zeisler, his friend, $203.80 to "winterize" the boat for the upcoming winter. (Smith Dep. 12/12/16, Doc. 29 at PageID 136, 145.) Smith testified that he did not recall exactly what services he asked Zeisler to perform, nor did he recall whether he asked Zeisler to winterize the boat's air conditioner or sea strainer. (*Id.* at PageID 136–37.) Smith testified that he did not know exactly what was required to winterize a boat. (*Id.* at PageID 146.) He understood that Zeisler would perform the same tasks he had performed on the boat in previous years. (*Id.* at PageID 137–38.)

Zeisler averred that he winterized the boat each year solely by replacing the engine fluid with antifreeze and placing two portable heaters inside the boat, the same method he had witnessed an individual named John Clements perform for Smith's boat in 2008 and 2009. (Zeisler Aff., Doc. 70-1 at PageID 878; Zeisler Dep., Doc. 78 at PageID 1107.) Zeisler did not winterize or drain the air conditioning lines because he understood that Smith intended to use the boat sometimes over the winter and the boat systems required fresh water. (Zeisler Dep., Doc. 78 at PageID 1149.) The portable heater was intended to keep the air conditioner lines from freezing. (*Id.* at PageID 1125). Zeisler believed this was a "safe practice" to keep lines from freezing "if you check on your boat." (*Id.* at PageID 1155.) Smith was satisfied with the work that Zeisler performed. (Smith Dep. 12/12/16, Doc. 29 at PageID 151.)

The boat was docked at the Four Seasons Marina in Hamilton County, Ohio for the winter of 2013–2014. Smith heated the boat by keeping two central electric systems and two portable heaters turned on, just as he had done previous winters. (*Id.* at PageID 150–151.) Smith usually would visit the boat three or four times after Zeisler did his work. (*Id.* at PageID 151.) Zeisler visited the boat on or about December 22 or 23, 2013 and had no concerns about its condition. (Zeisler Aff., Doc. 70-1 at PageID 878.) Both Zeisler and Smith traveled to

Florida during the month of January 2014. (Zeisler Dep., Doc. 78 at PageID 1158–60.) The boat sank into the Ohio River on January 11, 2014.

Matthew Pais, an employee of Travelers Insurance Company, investigated the loss of the boat on behalf of SFIC. He retained David Timpani, the accredited marine surveyor, to "complete an inspection of this boat to determine why it sunk." (Pais Dep., Doc. 63 at PageID 570.) On February 15, 2014, Pais spoke to Smith. (*Id.* at PageID 576.) Smith sent Pais the handwritten receipt indicating that he paid Zeisler $203.80 to "winterize boat for 6 hours" and for expenses. (*Id.*; Doc. 63-4 at PageID 638.) Pais spoke to Zeisler on January 16, 2016. Pais's summary of the conversation indicates that Zeisler told him that he winterized the boat as he had done for the previous two years, that there was a heater on the boat, and that Zeisler had confirmed the heater was working in December 2013. (Pais Dep., Doc. 63 at PageID 584–85.) Pais does not remember whether Zeisler specifically used the term "winterize" or if he [Pais] used that term in his notes to summarize his understanding of the work Zeisler performed. (*Id.* at PageID 584.) When asked at his deposition whether Zeisler explained to him that he had "winterized the engines[,]" Pais responded that did not recall, but that it was "possible." (*Id.* at PageID 591.)

> Zeisler sent Pais a written note at Pais's request in which he stated as follows:
>
> This letter is in response to your request for information concerning the winterization of Roy Smith's boat.
>
> As I stated to you earlier, Roy and I have been friends for many years.
>
> In regard to the boat, which he has owned for the past five or six years, there has been no issue of any kind regarding the winterization of Roy's boat. Due to the extreme weather conditions in this area, I was told that five other boats have gone down—sunk.
>
> Dan Zeisler

(*Id.* at PageID 586–87; Doc. 63-5 at PageID 639.)

4

Pais communicated with Timpani on February 4, 2014. Timpani told him that the boat sank because of "freeze damage to the air conditioning sea strainers." (Pais Dep., Doc. 63 at PageID 602; Doc. 63-2 at PageID 635.) The engines, or the condition of the engines, did not play a role in the sinking of the boat. (Pais Dep., Doc. 63 at PageID 602; Timpani Dep., Doc. 45 at PageID 352.) Timpani testified that the engines appeared to have been properly winterized. (Timpani Dep., Doc. 45 at PageID 357.)

Pais also spoke again with Zeisler on February 4, 2014. (Pais Dep., Doc. 63 at PageID 605.) Zeisler told him that he did not winterize the air conditioning system for the boat because he set up the heater for that system. (*Id.*; Doc. 63-2 at PageID 635.) Zeisler stated that he had learned that process from the prior mechanic. (Pais Dep., Doc. 63 at PageID 605; Doc. 63-2 at PageID 635.) Finally, Zeisler expressed his belief that either the power went out or that it became so cold that the "heater could not keep warm enough." (Doc. 63-2 at PageID 635.)

Pais concluded that the Winterization Exclusion in the Policy did not apply to exclude coverage for the loss of Smith's boat. Pais testified at his deposition that the Winterization Exclusion provides that SFIC would not cover the loss if "*the insured* doesn't properly winterized [*sic*] the boat per manufacturer's specifications or customs of the area." (Pais Dep., Doc. 63 at PageID 612 (emphasis added).) He testified that the Winterization Exclusion did not apply because Smith paid someone else to do the winterization, but he conceded that it might have applied if Smith had done the same winterization procedure himself. (*Id.* at PageID 612–14.) He also said that he might have handled the investigation differently if he had been told that Zeisler and Smith had an agreement as to the scope of the winterization work done. (*Id.* at PageID 622–23.) Pais conceded that he could not determine the scope of the work agreed to between Zeisler and Smith simply by the use of the term "winterize" on the invoice receipt for

5

the services performed. (*Id.* at 626.) Pais agreed that he would "have to talk to the people involved" to understand what services were performed. (*Id.*)

SFIC paid to CBS, the entity owned by Smith, the sum of $158,907.50 on the Policy. (Doc. 37 at PageID 193.)

**B.     Procedural History**

SFIC initiated this suit against Zeisler on December 18, 2015 seeking indemnification for the sum it paid on the Policy to Smith. On February 27, 2017, Zeisler moved for leave to file a third-party complaint against Smith and CBS. (Doc. 20.) Zeisler asserted that Smith and CBS were contributorily negligent or liable to him for indemnification because Smith allegedly authorized or approved of the method by which he winterized the boat. On June 15, 2017, the Court denied Zeisler leave to file the third-party complaint. (Doc. 35.) The Court determined, in part, that "[u]nder [insurance] subrogation principles, Zeisler can assert the contributory fault defense—the defense that CBS and Smith were contributorily negligent for the sinking of their boat—against Standard Insurance." (*Id.* at PageID 188.)

On June 13, 2017, SFIC filed an Amended Complaint asserting four causes of action:

Count 1: Negligence

Count 2: Breach of Express and/or Implied Warranty

Count 3: Breach of Contract

Count 4: Implied Warranty of Workmanship under Federal Maritime and Admiralty Law

(*Id.* at PageID 192–94.) Despite having paid $158,907.50 on the Policy, SFIC now is seeking to recover from Zeisler only the actual cash value of the boat determined by its expert to be $85,000. (*Id.* at PageID 193–95.)

Zeisler now moves for summary judgment as to all of the claims against him, though he does not provide separate analysis for each of the four claims. Instead, he makes the generalized argument that he cannot be held liable to SFIC because Smith, its insured-subrogor, authorized and approved the method by which Zeisler winterized the boat. SFIC opposes the granting of summary judgment to Zeisler. It, likewise, makes only a generalized argument that Zeisler was responsible for the winterization of the boat and his lack of due care led to the boat sinking. The matter is ripe for adjudication.

## II.  STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts."

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

The Court's task to adjudicate the pending Motion has been made more difficult because the parties did not adequately brief the relevant legal issues. Zeisler cursorily listed the elements of a breach of contract claim and a negligence claim, but not of either warranty claim. (Doc. 70 at PageID 874; Doc. 73 at PageID 918.) Neither party specifically analyzed how the facts here support or disprove the elements of any of the claims. Without doing the parties' work for them, it suffices here to simply observe that Zeisler cannot be held liable for breach of contract, negligence, or breach of a warranty if he was retained by Smith only to winterize the boat's engines. The evidence is undisputed that Zeisler winterized the engines and the condition of the engines did not cause the boat to sink. However, as set forth below, material facts remain in dispute as to the scope of winterization duties undertaken by Zeisler.

Additionally, regarding the legal issues not fully briefed, Zeisler made a two-sentence argument for the first time in his Reply brief that the economic-loss doctrine precluded SFIC's negligence and warranty claims. (Doc. 73 at PageID 917.) It would be unfair for the Court to

grant summary judgment on this basis when SFIC did not have a chance to rebut that argument in its Memorandum in Opposition. *Cf. Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held, however, that arguments made to us for the first time in a reply brief are waived.").

Finally, as stated above, it is evident that disputed questions of material fact abound precluding summary judgment. Did Zeisler and Smith come to a "meeting of the minds" as to what services would be performed when Smith paid Zeisler to winterize the boat? Did Smith intend for Zeisler to winterize only the engines? Did Smith rely on Zeisler as to the proper manner to winterize the boat? Did Zeisler winterize the boat in accordance with the Winterization Exclusion in the Policy, that is in accordance with the customs of the area? Was it reasonable for Zeisler to assume that Smith would check on the boat periodically to ensure that the portable heaters were working? Did Zeisler assume the responsibility to check the heaters and ensure they were working properly? In light of these disputed material facts, the Court cannot conclude at this time that Zeisler is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 70) is **DENIED**. The Final Pretrial Conference is set for March 22, 2018. (Dkt. Entry 10/4/2017.) Pursuant to the Court's Standing Order on Civil Procedures, the proposed joint Final Pretrial Order and separate *ex parte* settlement letters must be submitted to the Court via email no later than March 15, 2018. Additionally, Court hereby **ORDERS** that the parties also each must electronically file no later than March 15, 2018 separate Pretrial Briefs, no longer than 10 pages, addressing the following topics:

- The elements for each separate cause of action asserted in the Amended Complaint and an analysis of how the facts in the record support or tend to disprove each element;

- An explanation of the economic-loss rule in Ohio and how it applies to each separate cause of action asserted in the Amended Complaint;

- Other legal arguments relevant to a potential Federal Rule of Civil Procedure 50 motion at trial.

The Pretrial Briefs should be fully supported with citations to relevant law and evidence in the record in the format required by this Court's Standing Order on Civil Procedures. Failure to comply may result in the issuance of sanctions against the filing attorney.

**IT IS SO ORDERED.**

Dated this 20th day of February, 2018.

BY THE COURT:

S/Susan J. Dlott_____
Susan J. Dlott
United States District Judge